# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

TINA LOUISE WANNER,

                    Plaintiff,

        v.                                 Case No. 20-CV-987

KILOLO KIJAKAZI,[1]
**Acting Commissioner of the Social Security Administration,**

                    Defendant.

---

# DECISION AND ORDER

---

## 1. Introduction

Alleging she has been disabled since July 25, 2014 (Tr. 13), Tina Louise Wanner seeks disability insurance benefits and supplemental security income. After her application was denied initially (Tr. 58-77) and upon reconsideration (Tr. 98-121), a hearing was held before an administrative law judge (ALJ) on July 16, 2019 (Tr. 31). On August 23, 2019, the ALJ issued a written decision concluding that Wanner was not disabled. (Tr. 25.) After the Appeals Council denied Wanner's request for review on April

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

30, 2020 (Tr. 1-4), she filed this action. All parties have consented to the full jurisdiction of a magistrate judge (ECF Nos. 4, 6), and this matter is ready for resolution.

## 2. ALJ's Decision

In determining whether a person is disabled, an ALJ applies a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one the ALJ determines whether the claimant has engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). The ALJ found that Wanner "has not engaged in substantial gainful activity since July 25, 2014, the alleged onset date[.]" (Tr. 15.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c). An impairment is severe if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). The ALJ concluded that Wanner has the following severe impairments: "degenerative disc disease of the lumbar spine and continued difficulties with the left elbow post surgery[.]" (Tr. 16.)

At step three the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (called "the listings"), 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii), 416.925. If the impairment or impairments meets or medically equals the criteria of a listing and also meets the twelve-

month durational requirement, 20 C.F.R. §§ 404.1509, 416.909, the claimant is disabled. 20

C.F.R. §§ 404.1520(d), 416.920(d). If the claimant's impairment or impairments is not of a

severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds

to the next step. 20 C.F.R. §§ 404.1520(e), 416.920(e). The ALJ found that Wanner "does

not have an impairment or combination of impairments that meets or medically equals

the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix

1[.]" (Tr. 19.)

In between steps three and four the ALJ must determine the claimant's residual

functional capacity (RFC), which is the most the claimant can do despite her impairments.

20 C.F.R. §§ 404.1545(a)(1), 416.945(a). In making the RFC finding the ALJ must consider

all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. §§

404.1545(a)(2), 416.945(a)(2). In other words, "[t]he RFC assessment is a function-by-

function assessment based upon all of the relevant evidence of an individual's ability to

do work-related activities." SSR 96-8p. The ALJ concluded that Wanner has the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)
> except with occasional climbing of ladders, ropes or scaffolds, occasional
> stooping, kneeling, crouching, and crawling. She can frequently climb
> ramps or stairs and balance. The claimant may have no more than
> occasional concentrated exposure to wetness, vibrations, or to hazards such
> as dangerous, moving machinery or unprotected heights.

(Tr. 19.)

After determining the claimant's RFC, the ALJ at step four must determine

whether the claimant has the RFC to perform the requirements of her past relevant work.

20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1560, 416.920(a)(4)(iv), 416.960. The ALJ concluded that Wanner "is capable of performing past relevant work as an accounting clerk. This work does not require the performance of work-related activities precluded by [Wanner's] residual functional capacity[.]" (Tr. 23.)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c), 416.920(a)(4)(v), 416.960(c). At this step the ALJ concluded that "there are other jobs that exist in significant numbers in the national economy that the claimant also can perform[.]" (Tr. 23.) In reaching that conclusion the ALJ relied on testimony from a vocational expert, who testified that a hypothetical individual of Wanner's age, education, and work experience could perform the requirements of occupations such as "information clerk (DOT # 237-367-018), with 63,000 jobs in the national economy, cashier (DOT # 211.462-010), but with job numbers eroded by 50% to 100,000 jobs in the national economy, and office helper (DOT # 239.567-010), with 40,000 jobs in the national economy." (Tr. 24.)

### 3. Standard of Review

The court's role in reviewing an ALJ's decision is limited. It must "uphold an ALJ's final decision if the correct legal standards were applied and supported with substantial evidence." *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) (citing 42 U.S.C. § 405(g)); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). "Substantial evidence is 'such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (quoting *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010)). "The court is not to 'reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). "Where substantial evidence supports the ALJ's disability determination, [the court] must affirm the [ALJ's] decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled.'" *L.D.R. by Wagner*, 920 F.3d at 1152 (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

## 4.    Analysis

### 4.1. Symptom Severity

An ALJ must engage in a two-step process to evaluate a claimant's symptoms. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." SSR 16-3p. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work related activities…." SSR 16-3p. "The determination or decision must

contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p.

The ALJ must also consider, to the extent they are relevant, the following factors:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p.

The ALJ stated, "[a]s for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent with her treatment records." (Tr. 21.) She explained,

> The medical records show the claimant has a long history of chronic back pain and left elbow pain, but the claimant was observed by her medical providers to ambulate normally and without reference to the use of an assistive device (Exhibit 16F-6, 9/10, 13). In addition, no abnormality was detected as to her level of distress (Exhibit 14F-4) (Exhibit 16F-9). Also, diagnostic imaging of the lumbar spine and the claimant's left elbow showed only mild degenerative changes (Exhibit 12F-4/5, 12) (Exhibit 15F-12). Furthermore, despite the claimant's testimony that she is limited to sitting or standing for no more than 30 minutes at a time before she needs to rest or lie down, there is little objective evidence indicating particular

6

physical limitations to substantiate the degree of her subjective complaints. Also, the nature and scope of the claimant's treatment has been conservative after her fusion surgery at age 18, and has consisted only of injections, physical therapy and pain management (Exhibit 1F) (Exhibit 14F) (Exhibit 16F). She has not required emergency intervention or hospitalization related to her medical impairments, nor has she been referred for more aggressive treatment modalities. In addition, the claimant testified that she could perform activities of daily living such as cooking, cleaning, shopping, although she receives assistance from her son with laundry and vacuuming. While her activities of daily living do not necessarily show she can work full time, they do show that she is capable of motion. Further, the claimant reported that she drives on a fairly regular basis. Depsite [sic] her testimony of daily, chronic back and elbow pain, objective findings from May 2019 documented full range of motion of her upper and lower extremities and back, and normal sensation (Exhibit 15F - 6/7).

(Tr. 21.)

Although ALJs often note the absence of "aggressive" treatment to support a finding that a claimant's symptoms are not as severe as alleged, such an observation implies that, if the claimant's symptoms were as severe as alleged, more aggressive treatment would have been employed. *See Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013). But for some impairments there may be no "aggressive" treatment options. *Wieland v. Saul*, No. 19-CV-1066-SCD, 2020 U.S. Dist. LEXIS 75071, at *12 (E.D. Wis. Apr. 29, 2020) ("Although it is true that Wieland was treated primarily with medication and physical therapy, the ALJ provides no basis for believing that Wieland's fibromyalgia could have been treated with more 'aggressive' methods.").

This is not to say that such an observation is irrelevant or that an ALJ necessarily errs in making it. After all, the nature of a claimant's treatment is a relevant factor in

assessing the severity of a claimant's symptoms. SSR 16-3p. And it is within the purview of a lay ALJ to observe that serious back problems often lead to surgery. *See Green v. Saul*, No. 19-CV-528, 2020 U.S. Dist. LEXIS 41061, at *9 (E.D. Wis. Mar. 10, 2020). But in the absence of medical evidence suggesting that more aggressive treatment would have been recommended if Wanner's symptoms were as severe as she alleged, the absence of more aggressive treatment is not particularly probative. Having said that, not every reason given by the ALJ must be independently sufficient to sustain the ALJ's conclusion. The court must assess the ALJ's reasoning as a whole.

Wanner notes that her long history of being prescribed powerful opioid analgesics and other measures she has taken to relieve pain all tend to corroborate her complaints of subjective pain. She is correct that the fact she was prescribed opioids and took other steps to relieve pain certainly supports her allegations of pain. But the ALJ did not reject Wanner's complaints of pain; she concluded only that Wanner's pain was not as severe as she alleged. Wanner has not shown that this evidence required the ALJ to accept her allegations regarding the severity of her symptoms. Wanner's treatment history was consistent with the ALJ's RFC finding.

Nor did the ALJ err in her assessment of Wanner's activities of daily living. The ALJ explicitly acknowledged that Wanner's activities did not, by themselves, suggest an ability to work fulltime. Rather, the ALJ appropriately noted that Wanner's activity level could be seen as inconsistent with her allegations regarding the severity of her symptoms.

Granted, Wanner's activities were limited. And given the variable nature of her pain and the flexible nature of her activities, her activities might not be particularly probative as to the overall severity of her symptoms. Nonetheless, her activities of daily living were an appropriate factor for the ALJ to consider, *see* SSR 16-3p, and it was reasonable for the ALJ to conclude that the nature and level of activity was inconsistent with the extreme debilitating symptoms Wanner described. Again, Wanner has not shown that this evidence required the ALJ to accept Wanner's allegations regarding the severity of her symptoms. Wanner's activities of daily living were consistent with the ALJ's RFC finding.

Mindful of the deference that the court owes to the conclusions of the ALJ, the court must conclude that, when assessed as a whole, the ALJ provided a sufficiently specific and clearly articulated explanation for why she concluded that Wanner's symptoms were not as severe as she alleged. Significantly, the ALJ did not reject that Wanner was significantly impaired. She concluded only that Wanner's symptoms were not as severe as she alleged. Wanner has not shown that the ALJ erred.

### 4.2. Dr. Jankus

Ward Jankus, M.D., performed a consultative examination of Wanner on November 10, 2017. In relevant part Jankus opined:

> Precise activity estimates are hard to quantify, although I do get the sense in her case that she is going to have a hard time being on her feet hours and hours at one time or sitting hours and hours and I do not doubt that probably every 15 to 20 minutes she is basically changing positions up and down off her feet throughout the course of her day, just as she describes.

9

> With her left lateral epicondylitis issues, she would have a hard time doing forceful or highly repetitive torquing, twisting, flexing, and extending motions at the left wrist.
>
> The right lateral epicondyle issues have been improved with that surgery, but it sounds like she is getting some dorsal finger extensor tendonitis with overuse, although, as noted above, it is pretty calm at the time of the appointment today.

(Tr. 728.)

The ALJ did not find Jankus's opinion persuasive because it "seems largely based on the claimant's subjective reports of pain. His physical examination of the claimant was fairly normal." (Tr. 22.) She continued,

> The undersigned finds that even if the opinion of Dr. Jankus was found to be persuasive, the claimant could still work. There is no documentation by the claimant's treating providers that she is off task because of her pain. Instead, examination notes frequently stated that the claimant is in no apparent distress and can ambulate normally (Exhibit 14F-4) (Exhibit 16F-6, 9/10, 13). The additional limitations noted by Dr. Jankus are not supported by the objective medical evidence of record.

(Tr. 22.)

Wanner argues that the ALJ erred in her assessment of Jankus's opinion, which ultimately led her to erroneously reject Jankus's conclusion that Wanner would need to shift positions every 15 to 20 minutes.

The ALJ must assess a medical opinion in terms of its persuasiveness, paying particular attention to how well the expert supports his opinion, how consistent the opinion is with the record, the source's relationship with the claimant, the expert's specialization and expertise, and any other particularly relevant factors. 20 C.F.R.

§§ 404.1520c(c), 416.920c(c). Although the ALJ must consider all of these factors, she need only explain how she considered supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

In terms of supportability, the ALJ appropriately noted that Jankus's opinion appears to have been based largely on Wanner's self-reported symptoms. (ECF No. 16 at 3.) Moreover, Jankus's physical examination was "fairly normal." (Tr. 22.) Although Jankus did note certain objective abnormalities, they were not inconsistent with the ALJ's qualified statement that his report was based "largely" on Wanner's subjective reports and his examination was "fairly normal."

Nor did the ALJ impermissibly "play doctor" when she characterized Jankus's physical examination of Wanner as "fairly normal." (Tr. 22.) An ALJ "plays doctor" when she interprets medical evidence and relies on that interpretation to support a conclusion. For example, in the absence of a corresponding medical opinion, an ALJ cannot interpret an absence of a need for insulin to conclude that a claimant's diabetes is not debilitating. *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009).

But an ALJ's decision will naturally involve summaries and characterizations of the medical evidence. This does not constitute "playing doctor" but rather is an integral and natural part of an ALJ's obligation to explain her decision. While the line between appropriately characterizing the medical evidence and impermissibly playing doctor may sometimes be hazy, the ALJ's characterization here remained well clear of any line.

However, with regard to the ALJ's obligation to discuss the consistency of Jankus's opinion with other evidence, the ALJ's assessment was terse. In relevant part she stated only that "the clinical records note no significant cervical or lumbar nerve root compression or myelopahtic issues," and "[t]he medical evidence of record including the consultative medical examination does not show additional limitations beyond what was determined by the State Agency physicians." (Tr. 22.) It is unclear what significance the ALJ attributed to her first observation; it is not readily apparent how the specified evidence would necessarily impact Wanner's need to shift positions. And the latter statement is a hollow conclusion that fails to build an accurate and logical bridge between the evidence and her conclusions.

This lack of explanation was material, however, only if Jankus's opinion was consistent with other evidence that the ALJ failed to discuss. In this regard Wanner points to evidence showing that she suffered certain objective abnormalities. (ECF No. 16 at 5.) The evidence to which she points, however, does not address the crucial issue—whether Wanner must shift positions every 15 to 20 minutes. The evidence suggests only that Wanner has impairments that limit her ability to work, which limitations the ALJ acknowledged with her RFC finding.

In sum, the ALJ did not materially err in assessing Jankus's opinion. Although she did not substantively address whether and to what extent Jankus's opinion was consistent with other medical evidence, any error was harmless because Wanner has not

shown that there was other medical evidence that supported Jankus's opinion that she would need to shift positions every 15 to 20 minutes. Wanner has not shown that the objective evidence identified by Jankus in his report and discussed in her brief support limitations greater than those included in the ALJ's RFC determination.

### 4.3. Dr. Frey

Jesse Frey, Psy.D., evaluated Wanner and prepared a psychological report. Frey opined that Wanner's "memory ability appears grossly intact," [c]oncentration appears adequate," and "[a]bstract thinking ability appear [sic] good" (Tr. 733.) Nonetheless, Frey opined that Wanner "is expected to have moderate limitations in her ability to maintain concentration, attention, and work pace." (Tr. 734.) Frey also concluded that Wanner would "have moderate limitations in her ability to respond appropriately to supervisors and coworkers" and would "have moderate limitations in her ability to withstand routine work stress and adapt to changes." (Tr. 734.)

As to Frey's opinion the ALJ stated:

> The undersigned does not find the opinion of Dr. Frey persuasive as such moderate limitations appear to be based solely on the claimant's subjective reports of chronic pain. In addition, such limitations are inconsistent with Dr. Frey's own mental status examination of the claimant, which was generally normal. The undersigned notes that Dr. Frey only examined the claimant one time.

(Tr. 17.) The ALJ further found that Wanner had no limitation in her memory because, based on Frey's testing, her memory was intact. (Tr. 17.) Wanner had only a mild limitation in interacting with others, in part, because Frey observed that Wanner was calm

and cooperative through the exam, and she interacted appropriately at the hearing. (Tr. 18.) She had only a mild limitation in concentrating, persisting, or maintaining pace, in part because Frey found her concentration was adequate. (Tr. 18.) She was also only mildly limited in adapting or managing herself, in part because Frey found that her mood was good, she was appropriately dressed with good hygiene, and she had normal thought content with intact judgment and insight.

The unexplained inconsistency between the objective testing and Frey's conclusions was a good reason for concluding that Frey's opinion was not persuasive.

Wanner contends that the ALJ's statement that her "moderate limitations appear to be based solely on the claimant's subjective reports of chronic pain" (Tr. 17) is contradicted by Frey's statement, "It should be noted that these capability statements are made clearly on her psychological abilities and are not any bearing on her physical capabilities or limitations." (Tr. 734.)

The syntax of Frey's statement is garbled, and there appear to be at least a couple incorrect or missing words, but it seems that Frey is saying that his opinion as to Wanner's function reflects only her psychological limitations and not her physical impairments. But that is not inconsistent with the ALJ's observation that the moderate limitations Frey identified "appear to be based solely on the claimant's subjective reports of chronic pain." (Tr. 17.) The ALJ noted that pain caused the psychological symptoms identified by Frey. For example, Frey stated that Wanner reported "mood instability due to pain" and

"irritability due to pain." (Tr. 732.) Frey also said, "The claimant appears to be having a difficult time adjusting to some very severe chronic pain that has been exacerbating over time." (Tr. 734.)

Frey obviously accepted Wanner's statements regarding the pain she experienced and then offered his opinion as to how such pain would affect her functioning. The ALJ, however, found that Wanner's pain was not as severe as she alleged. If Wanner's pain was not as severe, it logically follows that any psychological impairment from pain would likewise not be as severe.

As discussed above, the ALJ did not err in concluding that Wanner's symptoms were not as severe as alleged. Because Frey's opinion depended on Wanner's statements regarding the severity of her symptoms, when the ALJ concluded that Wanner's symptoms were not as severe as she alleged, it was reasonable for the ALJ to then conclude that Frey's findings were not persuasive.

The fact that Frey's opinion was based on a one-time examination was an appropriate factor for the ALJ to note in explaining why Frey's opinion was not persuasive. *See* 20 C.F.R. §§ 404.1520c(c), 416.920c(c). The fact that the ALJ ultimately credited the opinions of the state agency consultants who never examined Wanner is not inconsistent. Assessing the persuasiveness of opinions requires consideration of all relevant factors; while individual factors point in different directions, other factors may lead an ALJ to find a certain opinion more persuasive than another.

In sum, the ALJ reasonably concluded that Frey's opinion was not persuasive. Frey's conclusions were inconsistent with the objective testing he performed. And Frey's opinions depended on Wanner's symptoms being as severe as she alleged, but in concluding that her symptoms were not as severe as reported, the ALJ upset the premise for Frey's conclusions.

### 4.4. Mental Limitations

Wanner argues that, even accepting that ALJ's conclusion that she "had only mild limitations in her ability to: interact with others; concentrate, persist, and maintain pace; and adapt or manage herself (AR 18), the ALJ still erred by failing to account for her mild mental limitations in the RFC and in any hypotheticals to the VE." (ECF No. 16 at 12.)

The Commissioner responds, "Plaintiff's argument that the ALJ erred by not accounting for her mild mental health limitations is unpersuasive because the vocational expert testified that jobs still existed that she could perform even with mental health limitations, and Plaintiff does not identify any limitations that should have been included in the hypothetical questions." (ECF No. 17 at 17.) In the Commissioner's view, the vocational expert's testimony addressed Wanner's mild limitations in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. (ECF No. 17 at 17.) The ALJ asked the vocational expert "whether jobs existed for an individual who was unable to perform fast paced work or work with high production quotas …." (ECF No. 17 at 17.) "Plaintiff's counsel then asked whether Plaintiff would be

able to perform past relevant work with a restriction to occasional interaction with supervisors and coworkers, and the vocational expert testified that she would." (ECF No. 17 at 17 (citing Tr. 53).) And "Plaintiff's counsel asked about the levels of stress in Plaintiff's past relevant work, and the vocational expert testified that dealing with stress was not necessarily required for that position, but that it would vary depending on the employer." (ECF No. 17 at 17 (citing (Tr. 54).)

Neither the hypotheticals presented by the ALJ nor the follow-up questions posed by Wanner's counsel fully addressed Wanner's limitations in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. Although the ALJ found Wanner to have mild limitations in each domain, these impairments either individually and especially collectively may materially affect Wanner's employability.

The vocational expert did testify that a person who was limited to only occasional interaction with supervisors and co-workers could still perform Wanner's past relevant work as an accounting clerk. (Tr. 53.) However, he vocational expert did not offer an opinion as to how this impairment might affect other jobs. The error was material because, as discussed below, appropriate consideration of Wanner's mild limitations in concentrating, persisting, or maintaining pace, and adapting or managing oneself may have precluded Wanner's past relevant work as an accounting clerk.

As for Wanner's mild limitation in concentration, persistence, and pace, it is well-established that "[b]oth the RFC and the hypothetical question presented to a [vocational expert] must incorporate the 'totality of a claimant's limitations,' including any 'deficiencies of concentration, persistence and pace.'" *Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019) (unpublished) (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010)). This does not require an ALJ to use any specific magic words; she need only use language that "specifically exclude[s] those tasks that someone with the claimant's limitations would be unable to perform." *Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019) (unpublished) (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010)); *see also Morrison v. Saul*, 806 F. App'x 469, 474 (7th Cir. 2020) (unpublished). The vocational expert addressed concentration, persistence, and pace only in the context of work that is not "fast paced" and does not have "high production quotas." (Tr. 52.)

The ALJ's hypothetical to the vocational expert most conspicuously failed to address limitations in concentration. A person who suffers from significant pain could be expected to have difficulty concentrating. And while the ALJ stated that Frey's limited testing indicated Wanner's concentration was adequate, an isolated examination is not necessarily inconsistent with a mild limitation in this domain. Because Wanner's mental impairments are largely influenced by her pain, her adequate performance during Frey examination may simply reflect that her pain was not severe that day. The omission was

material because the representative jobs identified by the vocational expert, and especially Wanner's past relevant work as an accounting clerk, would appear to require a significant degree of concentration.

Similarly, the closest the vocational expert came to assessing the domain of "adapting or managing oneself" is when she addressed how an ability to deal with stress might affect Wanner's ability to do the identified jobs. (Tr. 54.) Although an ability to manage stress may be a component of this domain, it encompasses more:

> This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include: responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00 E. 4.

Taken together, mild limitations in these domains may significantly interfere with Wanner's ability to work. Because the vocational expert did not address how these mild impairments, individually or collectively, may affect Wanner's ability to work, remand is required.

**5.    Conclusion**

Although some of the ALJ's conclusions regarding the severity of Wanner's symptoms would not, by themselves, be sufficient to sustain the ALJ's conclusion, considering all of the ALJ's reasons collectively, the ALJ adequately explained why she

concluded that Wanner's symptoms were not as severe as she alleged. Because the ALJ did not err in her decision to discount the severity of Wanner's symptoms, she did not err in finding Dr. Frey's opinion unpersuasive given that his opinion largely depended on Wanner's reported symptoms.

Any error in the ALJ's assessment of Dr. Jankus's opinion was harmless because Wanner has not shown that there was other medical evidence that supported his opinion that Wanner would need to shift positions every 15 to 20 minutes.

However, the ALJ did materially err by failing to include Wanner's mild mental limitations in the hypotheticals presented to the vocational expert. Although Wanner's impairments were mild, when considered collectively and in conjunction with her other impairments, she may be unable to work. Therefore, remand is required.

A direct award of benefits, however, is inappropriate because not all factual issues have been resolved, *see Israel v. Colvin*, 840 F.3d 432, 441-42 (7th Cir. 2016), and the evidence is not such that it "can yield but one supportable conclusion." *Martin v. Saul*, 950 F.3d 369, 376 (7th Cir. 2020) (quoting *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)).

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and pursuant to 42 U.S.C. § 405(g), sentence four, this matter is **remanded** for further rulings

consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 23rd day of August, 2021.

WILLIAM E. DUFFIN
U.S. Magistrate Judge